FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2005 JUN 30 P 4: 31

SIGN
BY DEPUTY CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ADA M. ANDERSON, ET AL | : | CIVIL ACTION CV02-12-C1 |
| | : | |
| VERSUS | : | JUDGE TYSON |
| | : | |
| THE DOW CHEMICAL COMPANY | : | MAGISTRATE RIEDLINGER |

**SUPPLEMENTAL LEGAL MEMORANDUM OF THE DOW CHEMICAL COMPANY IN SUPPORT OF MOTION TO STRIKE OR EXCLUDE THE AFFIDAVIT OF DR. KENNETH RUDO**

**MAY IT PLEASE THE COURT:**

In its Motion for Summary Judgment, The Dow Chemical Company ("**Dow**"), supported by the affidavit of Jacquelyn Clarkson, Ph.D. and the Health Consultation published by the Agency for Toxic Substances and Disease Registry dated May 17, 2004, demonstrated the following:

1. Oral ingestion of vinyl chloride at the levels found in drinking water at the Myrtle Grove Trailer Park has never been associated with any observed or reported incidence of cancer in either humans or animals. ATSDR Report, § 3.1.1, p. 6. Thus, no epidemiological or toxicological data has ever revealed an increased risk of any cancer based on oral consumption at the dose levels observed at Myrtle Grove.

2. For dermal and inhalation exposures, "elevated levels of angiosarcoma of the liver" have been seen only in PVC production workers and "have not been seen in other individuals involved in the production or use of vinyl chloride." ATSDR Report, § 3.1.2, p. 7. Thus, no epidemiological or toxicological data has ever observed any incidence of cancer based on dermal or inhalation pathways at dose levels found at Myrtle Grove.

SCR

3. The ATSDR went on to conclude that even the theoretical risk of future disease in inconsequential from a standpoint of public health. ATSDR Report, Appendix F.

Dr. Kenneth Rudo, plaintiff's retained litigation toxicologist, challenges only the ATSDR assessment of theoretical risk. The ATSDR's finding of no public health risk at Myrtle Grove based on known dose levels, human epidemiology and animal toxicology are unchallenged. Dr. Rudo does not dispute the lack of observed human disease at the drinking water levels identified in the ATSDR report. Dr. Rudo does not dispute the toxicology profiles cited by the ATSDR regarding the known dose levels necessary to produce adverse health effects in either humans or animals. Dr. Rudo's analysis boils down to his opinion that any consumption of drinking water with vinyl chloride that exceeds the 2 parts per billion standard set by the Safe Drinking Water Act is an unreasonable risk. Thus, water that is not absolutely safe when measured against purely hypothetical risk is deemed unsafe by Dr. Rudo.

Dr. Rudo disagrees with Dr. Clarkson and the ATSDR findings on theoretical risk presented to residents and visitors of Myrtle Grove. So what? This finding or area of disagreement is not relevant to the pending motion because theoretical risk has never been accepted as vehicle for compensation in Louisiana's tort system. A theoretical or hypothetical risk of injury is not compensable in the absence of toxicological or epidemiological support for the risk. Furthermore, Dr. Rudo admits in his own supplemental affidavit that "there is not a standard commonly accepted risk methodology" that governs his risk assessment practice.[1] Thus, Dr. Rudo's own admissions shake the reliability of this sort of speculation when it comes to compensation based decision making.

[1] Rudo Supplemental Affidavit, ¶ 31.

**A DISAGREEMENT OVER THEORETICAL RISK IS NOT A DISAGREEMENT OVER A MATERIAL FACT.**

Under Louisiana law, "cause in fact" between an act and an alleged injury requires proof as to what probably happened as opposed to what "could" have happened and what is a "statistical possibility." Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a negligence claim. ***Perkins v. Entergy Corp.***, 98-2081 (La. App. 1st Cir. 12/29/99), 756 So.2d 388. For this reason, automobile drivers are not held liable for "almost causing an accident" in the absence of an actual accident and injury. While "almost causing an accident" may place someone at a significant increased risk of incurring an injury, a "near injury" is not compensable. Nor can someone be compensated because a driver violates federally mandated speed limitations and is a hazard to the highway but does not cause an accident. If an actual injury cannot be based on speculation, surely a hypothetical injury should not fall under a less rigorous standard.

In the context of toxic torts, the majority of courts, including the Louisiana Supreme Court, hold that where no discernable physical injury is present (i.e. when a plaintiff files a purely speculative claim) any cause of action based purely on exposure is premature.[2] Essentially, the cause of action does not develop or arise until the harmful effects are manifested. The Supreme Court of Louisiana summarized the current state of the law in this area by noting that, "[a] review of jurisprudence from other states reveals that a majority of jurisdictions have not recognized a cause of action for increased risk of future injury when the potential for the occurrence of future injury is speculative or merely 'possible.'" ***Bonnette v. Conaco, Inc.***, 2001-2767 (La. 1/28/03), 837 So.2d 1219 (citing cases from Rhode Island, Pennsylvania,

---

[2] *See* ***Bonnette v. Conaco, Inc.***, 2001-2767 (La. 1/28/03), 837 So.2d 1219 (illustrating multiple claims for damages based on exposure to asbestos where no injury or disease had developed) (citing cases from Rhode Island, Pennsylvania, Kentucky, and New Jersey).

Kentucky, and New Jersey). Thus, plaintiffs must prove their claims are more than possible. This is accomplished with plausible, reliable scientific evidence. According to ***Bonnette***, speculative claims that cannot be supported are not compensable.[3]

In the Fifth Circuit, theoretical risk has never been accepted to prove an injury. In a pre-***Daubert*** decision, the Fifth Circuit in ***Brock v. Merrell Dow Pharmaceuticals, Inc.***, 874 F.2d 307 (5th Cir. 1989), *modified by* 884 F.2d. 307, *cert. denied*, 494 U.S. 1046 (1990), held that that the lack of conclusive epidemiological evidence was sufficient to deny the plaintiff for an increased risk of injury in a pharmaceutical case. In ***Brock***, the Fifth Circuit warned that animal studies have a very limited usefulness and openly stated, "[h]opefully, our decision will have the effect of encouraging district judges faced with medical and epidemiological proof in subsequent toxic tort cases to be especially vigilant in scrutinizing the basis, reasoning, and conclusiveness of studies presented by both sides." ***Brock***, 874 F.2d. at 315.[4]

In ***Allen v. Pennsylvania Engineering Corp***., 102 F.3d 194 (5th Cir. 194), the Fifth Circuit eschewed the use of regulatory risk paradigms to find causation in a tort scheme in the

---

[3] A cogent treatment of the "increased risk" issue was provided by the Supreme Court of Texas in ***Merrell Dow Pharmaceuticals, Inc., v. Havner***, 953 S.W.2d 706 (Tx. 7/9/97) (hereafter "***Havner***"). The ***Havner*** court ruled on a case where the plaintiff was born with a limb reduction birth defect. Since an injury was already present the Supreme Court of Texas reviewed whether or not the plaintiff's case offered sufficient evidence to support a finding of causation between the birth defect and the prescription drug Bendectin. *Id.* The court held that:

> (1) properly designed and executed epidemiological studies indicating that exposure more than doubled the risk of injury may be part of evidence supporting finding of causation; but
> (2) other factors must be considered, and a plaintiff must, in addition, offer evidence excluding other possible causes of disease with reasonable certainty; and
> (3) the evidence was legally insufficient to establish that child's defect was caused by exposure to Bendectin.

*Id.*

The court in ***Havner*** strongly emphasized a relative risk level of 2.0, indicating a critical level equivalent to double that of the normal or unexposed population.[3] Apparently, "[c]ourts adopting such a requirement have found that the requirement of a more than 50% probability means that epidemiological evidence must show that the incidence of an injury or condition in the exposed population was more than double the incidence in the unexposed or control population." ***Cano v. Everest Minerals Corp***., 362 F.Supp.2d 814, 820 (W.D. Tx. 3/28/2005).

[4] In post-***Daubert*** decisions, the Fifth Circuit has cited ***Brock*** with approval. See, ***Allen v. Pennsylvania Engineering Corp***., 102 F.3d 194, 197 (5th Cir. 1996).

absence of epidemiological evidence or reliable animal studies. In ***Allen***, the issue was whether the plaintiff's brain cancer was caused by his alleged exposure to ethylene oxide. Not a single epidemiological study had revealed a link between human brain cancer and ethylene oxide exposure. The Fifth Circuit did acknowledge a connection between ethylene oxide and lymphatic and blood cancers, but correctly found that such research was not probative on the issue of brain cancer. However, based on extrapolations and theoretical risk methods employed by regulatory agencies, the plaintiffs' experts opined an association between ethylene oxide exposure and brain cancer.

The Fifth Circuit placed the notion of theoretical risk viewed by regulatory agencies, unsupported by toxicological or epidemiological data, in its proper context. In this regard, the Court reasoned:

> **Regulatory and advisory bodies such as IARC, OSHA and EPA utilize a "weight of the evidence" method to assess the carcinogencity of various substances in human beings and suggest or make prophylactic rules governing human exposure. This methodology results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances. The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which "traditionally make [s] more particularized inquiries into cause and effect" and requires the plaintiffs to provide "that it is more likely than not that another individual has caused him or her harm."**

103 F.3d. at 198. In employing this rule of law, courts have easily reached the conclusion that the lack of proof of a substance's absolute safety does not make the substance dangerous. See, ***Bramley v. Pfizer, Inc***. 200 F.R.D. 596, 602 (S.D. Tex. 2001).

As a regulatory and public health agency, the ATSDR performed a literature review of epidemiological and toxicology data and found no observed incidence of disease that shows a public health consequence at Myrtle Grove. Addressing theoretical risk was a prudent "belt and suspenders" exercised by the ATSDR. "Quibbling with the ATSDR's theoretical risk calculation

may challenge the suspenders, but the belt remains intact. To the extent that plaintiffs cannot recover for an actual injury based upon a theoretical causation, *a fortiori,* the plaintiffs should not be able to recover for a theoretical injury based on theoretical causation.

## DR. RUDO'S OPINIONS REGARDING DERMAL AND INHALATION EXPOSURES ARE INTERNALLY INCONSISTENT WITH HIS ULTIMATE OPINIONS AND ARE NOT BASED ON RELIABLE EXPOSURE DATA

Almost the entirety of Dr. Rudo's original and supplemental affidavits are dedicated to his disagreements with the ATSDR over dermal and inhalation dose calculations. However, in his original risk assessment submitted in January of this year, Dr. Rudo found a significant increased risk of disease in only one classified groups of individual: persons who **orally** consumed more than 50 liters of water that contained elevated levels of vinyl chloride. The only affidavits submitted in this suit provide data or information related to oral consumption only. No plaintiff has submitted an affidavit to either the Court or Dr. Rudo by which to quantify any individual's dose through inhalation or dermal exposure. Dr. Rudo's dose calculations regarding from alleged inhalation or dermal exposures are based entirely on hypothetical assumptions. Dr. Rudo has not performed or been provided with any information from any plaintiffs regarding duration of residence at the trailer park, frequency of visits, duration of visits, frequency of showering or bathing, dishwasher usage, ventilation or any other information necessary to do a particular dose calculation for any particular plaintiff based on dermal or inhalation exposure potential.

Given Dr. Rudo's identification of risk on the basis of oral consumption of water only, his opinions regarding dermal and inhalation calculations and his criticisms of the ATSDR on their dermal and inhalation calculations are not supported by sufficient facts or data. In ***Allen v. Pennsylvania Engineering Corp.,*** 102 F.3d 194, 198-199 (5th Cir. 1996), the Fifth Circuit held

Case 3:02-cv-00012-RET-SCR Document 276 06/30/05 Page 6 of 19

that "scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden of proof in a toxic tort case." Because oral exposure only is used by Dr. Rudo to define the "at risk" population, the entirety of the debate that he seeks to create on inhalation and dermal absorption is a red herring for purposes of this litigation. Dr. Rudo's debate with the ATSDR over dermal and inhalation calculations is a hypothetical debate for purpose **of these plaintiffs** in this lawsuit. Thus, the dispute is not over a fact material to the outcome of the claims and demonstrated herein.

**DR. RUDO'S RISK ASSESSMENT IS NOT SCIENTIFICALLY RELIABLE**

Recognizing that ***Daubert's***[5] scientific reliability test is "flexible"[6], ***Daubert*** sets forth four specific factors that the court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. ***Daubert***, 509 U.S. at 589-90. These factors are applicable because the subject matter of Dr. Rudo's opinions is public health risk assessment, which even he concedes should be a question of applied science. Rudo Supplemental Affidavit, ¶ 9.

**(1) Can Dr. Rudo's risk assessment methods be tested?**

Fifth Circuit law requires that the plaintiffs show that Dr. Rudo's testimony is reliable. ***Moore v. Ashland Oil Co.,*** 151 F.3d 269, 276 (5th Cir. 1998). The problem here is that we still do not have Dr. Rudo's risk calculations. We may have his dose calculations, but the calculations from dose to risk still have not been provided. During Dr. Clarkson's deposition,

[5] ***Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 2796-97 (1993).
[6] ***Kuhmo Tire Co. v. Carmichael***, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

counsel for plaintiffs suggested that Dr. Rudo had used risk values from the maximum allowable concentration in order to perform risk calculations. However, to this day, Dr. Clarkson still is unable to replicate the risk calculation derived from Dr. Rudo's dose calculation. As stated by Dr. Clarkson during her deposition:

> **But, you know, we still have to stay we don't have that big missing piece of how – you know, this is all dose information, but still don't have that missing piece of how you get to the risk estimate.**

Clarkson Deposition, p. 224.

> **As I said before, Dr. Rudo provided dose calculations. He didn't – and he kept saying I used what ATSDR used, and ATSDR had seventy years in their calculation. And then he said – and then he said, here is my risk numbers. And again, we couldn't get where he was. One of the things that was missing in the equations was the seventy. Again, as I said, we took the information and the numbers we got were not what Dr. Rudo was reporting in the text.**

Clarkson Deposition, p. 230.

> **So I don't know if that means – all I can do is say his information can't be reproduced using standard methodology. So one would assume that either there isn't one, there aren't any equations from the dose to the risk levels, or they're not correct.**

Clarkson Deposition, p. 239.

When asked whether Dr. Rudo's use of oral-based tosixity values for all exposure routes could explain the discrepancy between his risk opinion and the ATSDR's opinion, Dr. Clarkson replied:

> **Oh, not with the huge order of magnitude differences. I mean, Rudo is way out there. I mean, I couldn't come up with anything that could get me in the ballpark correctly..**
>
> **You had his tables, and you had a dose, but you need to have the rest of the equations that give you the risk number at the end of it. I mean, when you go through the ATSDR report, you can multiply, add, subtract, divide, and you end up with the number. I couldn't do that with Dr. Rudo using the correct methodologies.**

Clarkson depo., p. 240.

Neither Dow nor the Court should have to glean a methodology from Dr. Rudo's affidavit. All of the calculations should be transparent. By failing to show all his calculations, he also failed to follow the standard procedure in his field, which requires scientists to show all steps in their work:

> **US EPA standard risk assessment practices under CERCLA requires complete and transparent documentation of risk assessment work.** In 2004, USEPA reiterated its emphasis on transparency and complete documentation in An Examination of EPA Risk Assessment Principals and Practices (EPA100B-04-001) March 2004). This serves to reinforce the agency's position on transparency documented in RAGS Part D and RAGS Part A Page 8-26, Section 8.6.2 (Summarize Risk Information in Tables): A tabular summary of the cancer risks and noncancer hazard indices should be prepared for all exposure pathways and land uses analyzed and for all substances carried through the risk assessment. These tables must be accompanied by explanatory text, ... and should not be allowed to stand alone as the entire risk characterization (US EPA, 1989).
>
> **All sources must be documented and intermediate calculation steps must be presented to assure transparency.** US EPA's commitment to transparency is demonstrated in the development of standard tables formatted as presented in the appendices to RAGS Part D. These tables give clear examples of the format and level of documentation required in risk assessment (US EPA, 1989).

Dr. Clarkson Affidavit, p. 5, ¶ 8.[7] Thus, the opinions are not testable and the opinion is not reliable under ***Daubert***.

**(2) Have Dr. Rudo's opinions been subjected to peer review or publication?**

Dr. Rudo's opinions have been purchased for this litigation exclusively and have not been subjected to any peer review or publication other than the review provided by Dr. Clarkson in this matter, which is highly critical of Dr. Rudo's methods. On the other hand, the ATSDR Health Consultation was not prepared for litigation. The ATSDR Health Consultation has been the subject of intensive focus that began with a preliminary report in 2002 and a final report in

[7] This affidavit was filed as an exhibit to Dow's original motion to strike the affidavit of Kenneth Rudo.

May of 2004. The ATSDR Report was prepared by a toxicologist, two environmental health scientists, a health education specialist and a community involvement specialist.[8] The report was peer reviewed and approved by five additional individuals employed by the ATSDR including two toxicologists.[9]

**(3) What is the known error rate for Dr. Rudo's risk assessment?**

In her affidavit filed with Dow's motion to strike Dr. Rudo's affidavit, Dr. Clarkson pointed out Dr. Rudo's failure to perform an uncertainty analysis with his risk assessment. Dr. Rudo still has not provided an uncertainty analysis. In a leading text on risk assessment entitled Paustenbach, HUMAN AND ECOLOGICAL RISK ASSESSMENT, 2002, at p. 252, the importance of uncertainty must be addressed in a formal risk assessment:

"The decision analysis literature has focused on the importance of explicitly incorporating and quantifying scientific uncertainty in risk assessments. Reasons for addressing uncertainties in exposure assessments include:

- Uncertainty information from different sources and of different quality must be combined.

- A decision must be made about whether and how to expend resources to acquire additional information (e.g., production, use, and emissions data; environmental fate information; monitoring data; population data) to reduce the uncertainty.

- So much empirical evidence exists that biases may occur, resulting in so-called best estimates that are not very accurate. Even when all that is needed is a best-estimate answer, the quality of the answer may be improved by incorporating a frank discussion of uncertainty into the analysis.

- Exposure assessment is an iterative process. The search for an adequate and robust methodology to handle the problem at hand may proceed more effectively, and to a more certain conclusion, if the associated uncertainty is explicitly included and it can be used as a guide in the process of refinement.

- A decision is rarely made on the basis of a single piece of analysis. Further, it is rare for there to be one discrete decision; a process of multiple decisions spread

[8] ATSDR Report, p. 19.
[9] ATSDR Report, p. 20

over time is the more common occurrence. Chemicals of concern may go through several levels of risk assessment before a final decision is made. During this process, decisions may be made based on exposure considerations. An exposure analysis that attempts to characterize the associated uncertainty allows the user or decision maker to do a better evaluation in the context of the other factors being considered.

- Exposure assessors have a responsibility to present not just numbers but also a clear and explicit explanation of the implications and limitations of their analyses. Uncertainty characterization helps to achieve this.

Essentially, constructing scientifically sound exposure assessments and analyzing uncertainty go hand in hand. The reward for analyzing uncertainties is knowing that the results have integrity or that significant gaps exist in available information that can make decision making a tenuous process."

An error rate does exist with respect to Dr. Rudo's risk assessment but his failure to perform an uncertainty analysis keeps such information out of the Court's hands. As stated by Dr. Clarkson at her deposition:

> **So, yes, there is an uncertainty section in any risk assessment that is performed that is supposed to look at where risk may be under or overestimated.**

Clarkson Depo., p. 186. Dr. Rudo's failure to provide an uncertainty analysis violates the "known error" criteria of ***Daubert*** analysis and renders his opinion scientifically unreliable.

**(4) Does the relevant scientific community generally accept Dr. Rudo's technique?**

Given the fact that Dr. Clarkson has been unable to identify Dr. Rudo's risk assessment technique, the answer is "no". More importantly, Dr. Rudo indicates to the Court in his supplemental affidavit that "there is not a standard commonly accepted risk methodology." Rudo Supplemental Affidavit, ¶ 31. This statement is code for "I'll do what I want to get where I need to be" and according to Dr. Clarkson does not comply with the standard of care for performing risk assessments:

> **There is uncertainty in risk assessment, and that's one of the reasons why the federal government and states have moved toward a standardized process so that one will have consistency and a standard of care that's performed in the risk**

**process, because you cannot have it both ways. Either you have some uniformity and standard of care to risk assessment, or its not of any use because anybody can do anything they want and provide, you know, anything and call it because of the uncertainty.**

Clarkson Depo., p. 185.

Dr. Rudo's technique is to derive risk solely by extrapolations from the maximum contaminant level goals (MCL) contained in the Safe Drinking Water Act. Even with this direction, Dr. Clarkson cannot replicate any calculations that might have been performed by Dr. Rudo. Clarkson depo., p. 192. Additionally, the MCL's cannot be used to get to a risk calculation according to Dr. Clarkson:

**The MCL's are for drinking water, for the Office of Drinking Water, purposes for regulating the water supply of the United States. They are based in risk assessment, and there are similarities in calculations that are used such as seventy kilograms body weight for an adult, two liters a day. However, risk assessment is looking at the consumption of that water as well – ingestion as well as inhalation and dermal and has a prescribed calculation for that. We do not take the MCLs and use them to make up risk numbers.**

Clarkson depo., p. 187.

## CONCLUSION

In summary, the Court should strike Dr. Rudo's testimony and opinions because they clearly fail to meet the admissibility standards outlined in Fed. R. Evid. 702 and *Daubert*. Dr. Rudo did not use the commonly accepted risk assessment methodology. His methodology is not recognized nor supported by peer-reviewed literature, nor is it capable of repetition. Furthermore, it has no known error rate. For all of those reasons, the Court should strike Dr. Rudo's affidavit and attachments.

Case 3:02-cv-00012-RET-SCR Document 276 06/30/05 Page 12 of 19

**TAYLOR, PORTER, BROOKS, & PHILLIPS, L.L.P.**

By ______________________________
John M. Parker, T.A., #10321
Anne. J. Crochet, #2010
David M. Bienvenu, #20700
Timothy J. Poche, #21823
451 Florida Street, 8th Floor
P.O. Box 2471
Baton Rouge, LA 70821
Phone: 225-387-3221
Fax: 225-346-8049

F. Barry Marionneaux #09277
F. Charles Marionneaux, #18320
23615 Railroad Avenue
Plaquemine, Louisiana 70764

Counsel for The Dow Chemical Company

## - CERTIFICATE -

I hereby certify that a copy of the foregoing as been mailed this date to :

William W. Goodell, Jr.
Post Office Box 52663
Lafayette, Louisiana 70505-6008

Stephen B. Murray
Murray Law Firm
909 Poydras Street, Suite 2550
New Orleans, Louisiana 70112-4000

Yolanda Batiste
Batiste & Batiste
Post Office Box 598
Plaquemine, Louisiana 70764

This the 30th day of June, 2005.

David M. Bienvenu, Jr.

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

ADA M. ANDERSON, ET AL :CIV. ACTION NO. 02-12-C-M1

VERSUS :JUDGE TYSON

THE DOW CHEMICAL COMPANY :MAGISTRATE RIEDLINGER

* * * * * * * * * * * * * * * * * * * * *

The deposition of DR. JACQUELYN RUTGERS CLARKSON, a witness in this Federal Court proceeding, was taken at the instance of the Plaintiffs herein, before and by Jeanie R. Smith, a Certified Court Reporter in and for the State of Louisiana, in the offices of Taylor, Porter, Brooks & Phillips, located at 451 Florida Street, 8th Floor, Baton Rouge, Louisiana, on the 12th day of May, 2005, commencing at 9:52 A.M., and ending at 4:30 P.M.

APPEARANCES:

For the Plaintiffs:

MR. DAMON A. KIRIN
Attorney at Law
909 Poydras Street, Suite 2550
New Orleans, LA 70112

APPEARANCES (Continued):

For the Defendant:

MR. JOHN M. PARKER
MR. DAVID M. BIENVENU, JR.
Attorneys at Law
451 Florida Street, 8th Floor
Baton Rouge, LA 70801

MR. F. BARRY MARIONNEAUX
Attorney at Law
23615 Railroad Avenue
Plaquemine, LA 70764

MS. KAREN E. DUGAS
Attorney at Law
21255 Highway 1 South
Plaquemine, LA 70764

INDEX

PAGE
STIPULATION. . . . . . . . . . . . . . 4
EXAMINATION BY:
MR. DAMON A. KIRIN . . . . . . . . . . . . 5
CERTIFICATION. . . . . . . . . . . . . . . 253
READ AND SIGN AFFIDAVIT. . . . . . . . . . 254

LIST OF EXHIBITS

EXHIBIT 1. . . . .Amended Notice of Deposition
EXHIBIT 2. . . . .Edition Of The Drinking Water Standards & Health Advisory
EXHIBIT 3. . . . .Affidavit
EXHIBIT 4. . . . .Petitioned Health Consultation
EXHIBIT 5. . . . .Health Consultation
EXHIBIT 6. . . . .Draft Toxicological Profile for Vinyl Chloride
EXHIBIT 7. . . . .Article
EXHIBIT 8. . . . .Dr. Clarkson's Calculations

STIPULATION

IT IS STIPULATED AND AGREED by and between counsel for the parties in the case above numbered and entitled that the testimony of DR. JACQUELYN RUTGERS CLARKSON, a witness in this Federal Court proceeding, shall be taken at the instance of the Plaintiffs herein, before and by Jeanie R. Smith, a Certified Court Reporter in and for the State of Louisiana, on the 12th day of May, 2005, commencing at 9:52 A.M., and ending at 4:30 P.M., in the offices of Taylor, Porter, Brooks & Phillips, located at 451 Florida Street, 8th Floor, Baton Rouge, Louisiana; that the witness shall be sworn by said Court Reporter so reporting; that the testimony shall be taken under oral examination, reserving all objections except those as to the form of the question and the responsiveness of the answer until the time of the trial of this matter; that the reading and signing of the deposition are not waived by the parties and by the witness; and that the said deposition is being taken pursuant to Notice as authorized under the Federal Rules of Civil Procedure.

assumption that the risk will be no higher than what you've put forth.

Q. And there's uncertainty in the risk assessment process, correct?

A. There is uncertainty in all processes, yes.

Q. Right. But particularly in the risk assessment process, you make a number of assumptions regarding exposure and other factors, and depending on what assumptions you make, the result you get in the risk assessment can change rather dramatically, correct?

A. There is uncertainty in risk assessment, and that's one of the reasons why the federal government and states have moved toward a standardized process so that one will have consistency and a standard of care that's performed in the risk process, because you can't have it both ways. Either you have some uniformity and standard of care to risk assessment, or it's not of any use because anybody can do anything that they want and provide, you know, anything and call it because of the uncertainty.

Q. Right.

A. So, yes, there is an uncertainty section in any

risk assessment that's performed that is supposed to look at where risks may be under or underestimated. So, again, to provide a perspective.

But, again, the reason that we've marched towards a more standard program in Louisiana, a promulgated standard, is because we need to -- for these hypothetical risks to have relevance to be used in environmental management decisions.

Q. Isn't it correct that ATSDR utilized what they termed the maximum estimated total exposure approach to estimate whether or not there was an increased risk in the vinyl chloride contaminated water?

A. Yes. ATSDR did use that. Yes.

Q. And you relied on that approach, correct?

A. Relied on it?

Q. Well, you endorsed their ultimate opinion.

A. Well, I said that I concurred with their opinion that there was no apparent public health threat, and I said that they did a thorough and detailed health consultation.

Again, the purpose of the affidavit in which -- that I was instructed was to look at a

report that said I prepared a risk assessment. So I was looking -- I was looking at risk assessment equations.

Q. Didn't Dr. Rudo utilize the same approach in evaluating risks that the ATSDR did?

A. Well, he has -- he starts out with similar things, and he has a very lengthy process of dose. And then he gives a risk level in his text, but he doesn't show you how he gets from the dose to the risk calculation.

Q. Can you use the MCLs like we just did earlier to get to a risk calculation?

A. The MCLs are for drinking water, for the Office of Drinking Water, purposes for regulating the water supply of the United States. They are based in risk assessment, and there are similarities in the calculations that are used such as seventy kilogram body weight for an adult, two liters a day.

However, risk assessment is looking at the consumption of that water as well -- ingestion as well as inhalation and dermal and has a prescribed calculation for that. We do not take the MCLs and use them to make up risk numbers.

Q. Okay. So you never, in connection with any of your professional responsibilities in trying to determine risk, look at an MCL to determination whether or not a population that's consuming water that's at or above an MCL is at increased risk?

A. One could use an MCL as a screening tool in which to determine whether or not there's potential for a problem and one needs to look further. I -- it's a regulatory standard for the safety of the water supply.

In the section at the health department and in my capacity now as a consultant, I would then carry that into a more specific risk assessment.

Q. Do you know if the EPA used risk assessment to develop the MCLs? And I guess a follow-up to that is, if they didn't, how does the EPA come up with lifetime cancer risks?

A. If you're defining risk assessment as using the process of translating what happens in the body to mathematical models to capture a characterization of risk, yes, many -- as we've discussed earlier, many of the federal agencies and state agencies use that process. However,

toxicity values is not correct, right, even though the ATSDR did that?
A. **ATSDR performed a health consultation. Dr. Rudo said, I performed a risk assessment. And under risk assessment, you would go to IRIS, and IRIS has an inhalation and an oral toxicity value for vinyl chloride.**
Q. So you're of the opinion that, even though you endorse the ATSDR approach, you have issues with Dr. Rudo's approach because you're under the impression that he performed a risk assessment, correct?
A. **I don't endorse anything.**
Q. Okay.
A. **I mean, I got offered an opinion that I thought there was -- that the ATSDR found no apparent public health threat. I felt they had done a thorough and detailed job of arriving at that statement, and in any opinion, I concur with that.**
Q. Well, you reviewed the 2002 ATSDR public health assessment, correct?
A. **Yes.**
Q. All right. And you didn't submit any comments to the ATSDR that it was incorrect for them to

use oral toxicity values for all exposure routes, did you?
A. **I do not believe that I did issue that. And let me be very clear, again, because I don't want us thinking that we're talking about things that -- like we're all scientists sitting around here debating how many of us we can fit, you know, in a small space. I think we need to get a grip on the relative order of magnitude of errors and deviation from standard methodology here. There is a hierarchy of use of information when one is performing a risk assessment, and there are inhalation and oral toxicity values available on IRIS.**
Q. Move on to children showering, the third item.
A. **Yes.**
Q. Children, while they don't shower, do bathe, don't they?
A. **Yes.**
Q. Children that are zero to two years?
A. **Yes.**
Q. And the bathing could be a potential exposure pathway for young children, can't it?
A. **It could be and -- yes, it could be an exposure pathway.**

Q. Go on to the next item, which is shower model. Dr. Rudo used the Andelman model in his risk approach, which is the same model that ATSDR used, correct?
A. **Correct. ATSDR used the Andelman, yes.**
Q. And, again, when you saw the ATSDR's 2002 publication, you didn't submit any comments regarding the inadequacies of the Andelman model, correct?
A. **Well, again, the Andelman model incorporates the bulk of the shower piece that's incorporated in the whole house model, and the Andelman model was the EPA shower model until it incorporated the whole house into it. But the majority, the greatest portion, of that is the showering part.**
Q. Do you think there's anything unreliable about using the Andelman model?
A. **The EPA shower model is Andelman, and Andelman forms a portion of the whole house model. So EPA uses that, as well. I would not --**
Q. Okay.
A. **I would not say it was unreliable to use that model, again, with all the caveats of what you're going to use it for and what you're**

**going to do with it and that you use it appropriately and correctly.**
Q. Sure. And then going down to dermal exposure, the ATSDR assumed that dermal exposure was equivalent with inhalation exposure, correct; those are your words?
A. **Yes.**
Q. And Dr. Rudo did the same thing the ATSDR did, correct?
A. **Well, he did -- when you work through his tables, you see that he basically took whatever dose he had for the shower and the inhalation, and he put that into his column for dermal.**
Q. Okay. And that's what the ATSDR did?
A. **Yes. I mean, they also had a full qualitative discussion of what they were doing with the shower in relationship to the dermal.**
**But, you know, we still have to say we don't have that big missing piece of how -- you know, this is all dose information, but we still don't have that missing piece of how you get to the risk estimate.**
Q. Well, he used the same maximum total exposure process that the ATSDR used. Didn't he explain that in his report?

dose and you criticize Dr. Rudo for not accounting for an averaging time?
A. Yes.
Q. Okay. And you remember how earlier we went through how the risk of MCLs can be adjusted based on the duration of exposure?
A. Yes.
Q. Well, --
A. **I mean, you went through that, yes.**
Q. I mean, if you adjust based on the years of exposure, then you don't need averaging time because the duration adjustment compensates for that factor, doesn't it?
A. **For the way that it's set up, it's set up to look at the consumption of a concentration over time and what would be the corresponding risk for that.**
**As I said before, Dr. Rudo provided dose calculations. He didn't -- and he kept saying, I used what ATSDR used, and ATSDR had seventy years in their calculation. And then he said -- and then he said, here is my risk numbers. And, again, we couldn't get where he was. One of the things that was missing in the equations was the seventy.**



**Again, as I said, we took the information and we put it into the standard equations, and the numbers we got were not what Dr. Rudo was reporting in the text.**
Q. Let me ask you the question this way. Does taking into account for averaging time in terms of evaluating risk, does that serve the same purpose as shortening the duration of exposure in evaluating risks?
A. **No.**
Q. Okay. And why not?
A. **Well, because averaging time is referring to the time that a person's body is average -- is dealing with that exposure. It relates more to toxicity piece, whether it's -- your averaging time is different, whether it's a cancer or a noncancer considered compound, or you're looking at cancer or noncancer effects.**
**So it's more related to that as opposed to -- it's not related to the exposure duration of how long or the fact that you -- where the MCL is an exposure for seventy years, where you're drinking that water every day for that time. It's not the same seventy.**
Q. So --



A. **And let's be real clear. I'm not sanctioning this MCL --**
Q. Right. I know.
A. **-- stuff.**
Q. You've made that clear.
A. **Okay.**
Q. So what does an averaging time adjustment do when you're evaluating exposure? Can you explain that?
A. **The averaging time adjusts for the dose that you receive, the period of time that there may be the potential to develop cancer. So it's seventy -- we assume that a short-term exposure is extrapolated over the lifetime of an individual for the development of cancer. So it's 25,550 days.**
Q. But averaging time, you're adjusting a short-term exposure for a lifetime of risk, correct?
A. **Well, in this case, it would be seven-seventieths.**
Q. In which case?
A. **The Myrtle Grove.**
Q. Where are you coming up with seven-seventieths? Seven years out of seventy, that would be the



average time?
A. **Not the averaging time, no. That would be the -- the seven years would be the exposure duration.**
Q. Right.
A. **And the seventy years would be the averaging time for the -- remember I said that models are a way to quantify what's happening --**
Q. Sure.
A. **-- in the body. You get an exposure. There's a potential for -- to develop disease.**
Q. Right.
A. **Yes.**
Q. So averaging time allows you to gauge the risk of an exposure that might be shorter than seventy years; is that correct?
A. **No.**
Q. Okay.
A. **Gauge the exposure, I wouldn't say that. I would say that -- I mean, we can look up the definition of averaging time. Do we want to do that? I believe it's in my deposition.**
MR. PARKER: It would probably be in the affidavit.
THE WITNESS: Yes, in the affidavit.

**A. -- thirty-one days.**
Q. But if his range is less or if he didn't assume that it was fourteen parts per billion throughout, then his calculations would tend to underestimate the risk, correct?
MR. PARKER: Objection to the form of the question. I think she stated she doesn't know what he has done and can't reproduce the calculation.
MR. KIRIN: Well, I'm not asking her about --
BY MR. KIRIN:
Q. I'm just saying, if you were to assume that, as you're stating under the Rudo approach, that he didn't assume fourteen parts per billion, that he made some assumption of a lesser exposure, any calculation assuming a lesser exposure would serve to underestimate risk, correct?
**A. One would -- depending on what other variables were used, if you have a lower concentration, one could produce a -- and we have to be careful when we talk lower and higher -- one would produce less of a risk, yes.**
Q. If you go on where you criticize Tables 3 through 8, this is the next page of your

document, you say, "Rudo sums the calculated exposures across the eleven time and concentration weighted exposure values." Didn't the ATSDR do the same thing in their total exposure approach, their maximum estimated exposure? This is Tables 3 through 8. Your criticism, "Rudo sums the calculated exposures across the eleven time and concentration weighted exposure values."
**A. Yes. And what I noted there was that he didn't change the body weights, or I couldn't tell that he had changed the body weights, because he appeared to continually be dividing. It was very difficult past Table 4 to determine what he was using, because he -- you really could only see the numbers ending up for the adult and the zero to two child.**
Q. But didn't ATSDR sum the same values in their maximum estimated total exposure model?
**A. I -- because I couldn't replicate Rudo, I'm not sure if I could be a hundred percent sure that he did what ATSDR did in theirs.**
Q. Yes. I'm just asking you if ATSDR did the same thing in terms of summing exposure.
MR. BIENVENU: Objection. Asked and

answered.
**A. ATSDR looked across the pathway and across -- and summed the pathways, yes.**
BY MR. KIRIN:
Q. And that's what Dr. Rudo did?
**A. Yes, for his dose calculation. Again, one could get the numbers that he had at the bottom, but then when those were put into a risk calculation, you don't get the numbers that he does.**
**So I don't know if that means -- all I can do is say his information can't be reproduced using standard methodology. So one would assume that either there isn't one, there aren't any equations from the dose to the risk level, or they're not correct.**
Q. But Dr. Rudo used oral-based toxicity values for all exposure routes, and you didn't do that, and the ATSDR didn't do that, correct?
**A. ATSDR used oral toxicity. We used -- in the calculations that I performed, I used oral for the dermal and oral, and I used inhalation for the inhalation.**
Q. So couldn't the different values there being used explain the discrepancy in the --

**A. Oh, not with the huge order of magnitude differences. I mean, Rudo is way out there. I mean, I couldn't come up with anything that could get me in that ballpark correctly.**
Q. Right. But you replicated many of his calculations, didn't you?
**A. I replicated how he got his numbers in his Table 3 and 4, like where did the .52 come from and stuff. Replicating what his thought process was for all of this, no, I wouldn't say I was able to do that.**
Q. And you didn't replicate or you claim you weren't able to replicate his cancer assessment for children, correct?
**A. I don't -- his cancer assessment for children.**
Q. Um-hum.
**A. As opposed to replicating anything else?**
Q. Um-hum.
**A. No. The problem was with all of it.**
Q. Okay.
**A. You had his tables, and you had a dose, but you need to have the rest of the equations that give you the risk number at the end of it. I mean, when you go through the ATSDR report, you can multiply, add, subtract, divide, and you**